# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00244-001 (CKK)** |
| **v.** | : | |
| | : | |
| **JERRY RYALS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Jerry Ryals ("Ryals") to six months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.     Introduction

The defendant, Jerry Ryals, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

On May 6, 2022, Ryals pleaded guilty to one count of violating 18 U.S.C. § 231(a)(3): Civil Disorder. As explained herein, a sentence of six months' imprisonment, with three years of supervision to follow, is appropriate in this case because: (1) on his way up the stairs of the

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Capitol to break inside, Ryals clearly observed the Capitol Police officers attempting to defend the building, and created a video with his cell phone in which he stated: "They are tear gassing, throwing flash bangs, pepper spray, but we will not concede."; (2) near the top of the stairs outside of the Capitol, after police officers had been overrun and people began breaking inside of the Capitol, Ryals filmed another cell phone video, this time stating: "We definitely have enough people to overthrow this bitch.  They don't stand a fucking chance.  We got the fucking doors open up there, I guess.  We're working our way in slowly but surely."; (3) Ryals illegally entered through a side door and approached a locked office door just inside the entrance; (4) after observing that the office door was locked, Ryals attempted to break down the door using his shoulder, and was then joined by other rioters who broke through the door; (5) Ryals, after remaining in the office for approximately 10 minutes, was forced out of the Capitol by police, but shortly thereafter reentered the Capitol where he remained for 30 minutes  walking to several locations,  including the Rotunda and the Crypt; (6) the next day, on January 7, Ryals posted a statement on Facebook, calling  himself a "patriot" and stating that the country was headed for war.

Owing to those substantial aggravating circumstances, the government recommends that the Court sentence Ryals to six months' incarceration, at the top of the advisory Guidelines' range of 0-6 months, which the government submits is the correct Guidelines calculation. A six-month sentence reflects the gravity of Ryals' conduct.

The Court must also consider that Ryal's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  *See United States v. Matthew*

*Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).   Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's statements and subsequent actions renders a six-month sentence of imprisonment both necessary and appropriate in this case.

## II.   Factual Background

### A.   The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Ryals among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.   Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the PSR and the Statement of Offense incorporated into Ryals's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.   By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to

resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.  At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.  All proceedings, including the joint session, were effectively suspended.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

**B.      Injuries and Property Damage Caused by the January 6, 2021, Attack**

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used

dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.  They caused extensive, and in some instances, incalculable, losses.  This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.  *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).  The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### C.     Ryals' Role in the January 6, 2021, Attack on the Capitol

Jerry Ryals participated in the January 6 attack on the Capitol.  His crimes are documented through his own cell phone video recordings and photos, open-source video, and surveillance footage from inside the Capitol.

6

On January 5, 2021, Ryals and two other men,[2] traveled from their homes in Oklahoma to a hotel outside of Washington D.C.  The next morning, on January 6, 2021, Ryals and his travel companions traveled to Washington D.C. to attend the "Stop the Steal" rally.  For the rally, Ryals wore a charcoal-colored jacket, blue jeans, and a red "2020 TRUMP" hat.



*Exhibit 1*

After attending the former President's rally, Ryals walked to the United States Capitol.



*Exhibit 2*

---

[2] One of the men, Anthony Griffith, is separately charged in Case No. 21-CR-244-002 with four misdemeanor counts.

Prior to heading up the stairs at the Upper West Terrace, Ryals filmed a nine-second cell phone video showing other rioters on the terrace.  In the video, Ryals stated; "They are tear gassing, throwing flash bangs, pepper spray, but we will not concede."  Ryals then headed up the stairs towards the Capitol building.  Near the top, Ryals filmed a ten-second cell phone video showing numerous rioters in front of the Capitol, with some attempting to enter.  In the video, Ryals stated: "We definitely have enough people to overthrow this bitch.  They don't stand a fucking chance.  We got the fucking doors open up there, I guess.  We're working our way in slowly but surely."

At approximately 2:42 pm, as shown in Exhibit 3.1, below, rioters broke open the northwest side door entrance to the Capitol, forcing five Capitol Police Officers back, and assaulting some of them on the way in.



*Exhibit 3.1*

Forty seconds later, at approximately 2:43 pm, Ryals entered the Capitol through the northwest side doors.  (Exhibit 3.2. Ryals is the person inside the red rectangle in the following photographs).



*Exhibit 3.2*

Once inside, Ryals milled around the hallway entrance and observed another rioter (inside the yellow rectangle) attempting to open a locked office to his left utilizing an entrance sign as a battering ram.  (Exhibit 3.3).



*Exhibit 3.3*

The rioter failed to penetrate the door and departed. Ryals then attempted to use his shoulder to break through the office door. When that failed, he picked up the same entrance sign for use as a battering ram. Ryals's attempts managed to break off the base of the sign.



*Exhibit 3.4*



*Exhibit 3.5*



*Exhibit 3.6*

Despite the sign breaking, Ryals continued to try and utilize his shoulder in breaking down the door, this time joined by five other men.  Using their combine force and weight, the rioters were able to break through the doors and enter the office space.



*Exhibit 3.7*

The office the rioters entered was, thankfully, unoccupied.  While inside, Ryals took a photo of himself enjoying a seat. (Exhibit 4).



*Exhibit 4*

After approximately two-and-a-half minutes, Ryals emerged from the office, but remained in the hallway. (Exhibit 3.8).



*Exhibit 3.8*

Prior to exiting out the entry doors, Ryals took some time to capture more video on his cell phone.  (Exhibit 3.9).  Ryals left approximately 11 minutes after he had entered.



*Exhibit 3.9*

Ryals, however, didn't leave the Capitol premises.  Instead, Ryals reentered the Capitol through the Senate Wing doors approximately 18 minutes after those doors had been breached by the mob, and just over ten minutes after Ryals exited the northwest side doors.  (Exhibit 5.1).



*Exhibit 5.1*

13

Once inside, Ryals made his way toward the line of police officers guarding one of the wings in an attempt to get a handshake. (Exhibit 5.2). The officers refused.



*Exhibit 5.2*

Ryals then headed off into the depths of the Capitol, (Exhibit 5.3), walking through several areas on multiple floors, including the Rotunda and the Crypt. Ryals spent approximately 30 minutes inside the Capitol after his reentry before exiting (Exhibit 9), taking photos and video while inside.



*Exhibit 5.3*

14



*Exhibit 6*



*Exhibit 7*



*Exhibit 8*

After leaving the Capitol, Ryals and the other individuals he arrived with stayed around the Capitol outskirts until approximately 6:30pm when they returned to their hotel in Virginia.



*Exhibit 9*

The next day, on January 7, 2021, Ryals and the others drove back to their homes in Oklahoma.  At some point that day, Ryals posted the following message on Facebook:



Where we go one we go all, and Yesterday was a monumental day in history. Millions of trump supporters lined out by the Washington monument to hear Trump, and after just minutes of his speech, before he had even gotten started, the patriots walked down toward Capitol Hill to #StopTheSteal

We reclaimed our Capitol, just to be slandered by the media pushing this Great Reset agenda and who have their hands in the CCP's pockets. I just ask the American people to wake up if you haven't already. Things are headed in the direction of a Revolutionary war against the corruption in our government. The media labeled us as "barbarians", yet every person I talked to today was a good hearted Christian, who all said they've never really gone to any rally, protest, or anything like what we did today. Seeing millions of patriots covering the streets from Capitol Hill to the Washington monument, on both streets, sidewalk to sidewalk, showed me the true nature of the American Spirit, and this corruption can go on no longer. It is our responsibility to handle this at all costs. We are not animals, we are not barbarians, we are the heart of this country and the last ones to stand up for your freedom. #GodBlessAmerica #Trump2020Landslide #nomorebullshit #Freedom

     

*Exhibit 10*

In pleading guilty, Ryals admitted that his actions at the U.S. Capitol Building on January 6, 2021, impeded and interfered with law enforcement officers engaged in official duties,

including, but not limited to, the protection and security of the United States Capitol.  Ryals also admitted that on January 6, 2021, on the grounds of the United States Capitol, numerous law enforcement officers with the Capitol Police were engaged in the performance of federally protected functions during the commission of a civil disorder – namely, a riot.  Ryals admitted that the civil disorder on January 6, 2021, obstructed and adversely affected the Capitol Police's performance of those federally protected functions.

*The Charges and Plea Agreement*

On February 22, 2021, the United States Attorney's Office for the District of Columbia charged Ryals in a five-count complaint with violating 18 U.S.C. § 1512(c)(2), 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2).  On May 6, 2022, he pleaded guilty to a one-count felony Information, charging him with a violation of 18 U.S.C.  § 231(a)(3), Civil Disorder.  By plea agreement, Ryals agreed to pay $2000 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Ryals now faces a sentencing on a single count of 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the U.S. Probation Office, Ryals faces up to 5 years of imprisonment, supervised release of up to 3 years, and a fine of up to $250,000.  Ryals must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines

should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the final PSR, with both parties in agreement on the total offense level. *See* PSR at ¶ 87. According to the PSR, the U.S. Probation Office calculated the adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 8 |

*See* PSR at ¶¶ 38-48.

The U.S. Probation Office calculated Ryals's criminal history as a category I, which the parties do not dispute. *See* PSR at ¶ 51. Accordingly, the parties believe Ryals's total adjusted offense level, after acceptance, is 8, and his corresponding Guidelines imprisonment range is 0-6 months. Ryals's plea agreement contains an agreed-upon Guidelines range calculation that mirrors Probation's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007);

28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines, as agreed to, in part, by the parties, unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies

and misdemeanors that will be subjected to Guidelines analysis.  In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, all of the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have

observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Ryals's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Ryals came to Washington D.C. on a mission – to disrupt the peaceful transfer of power after the 2020 Presidential election.  In so doing, and step-by-step along the way, he demonstrated little regard for the law, the officers charged with safeguarding the United States Capitol Building, or the people who work inside of it.

On January 6, 2021, Ryals was part of a violent mob that assaulted police officers, and proudly stormed the Capitol to obstruct lawmakers as they certified the 2020 election. Bolstering this contention is the fact that once inside the Capitol, Ryals helped break open an office door, presumably looking for something or someone to aid him in disrupting the certification, or worse.  Furthermore, in total, Ryals stayed within the Capitol for over 35 minutes, going from location to location, floor to floor.

Then, in the day that followed, Ryals championed his actions, and the actions of the other rioters, on Facebook, declaring himself and the other "patriots" and freedom fighters.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Ryals' History and Characteristics

As set forth in the PSR, Ryals does not have any prior arrests or convictions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument

can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).   And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Though Ryals has expressed remorse since his actions on January 6, 2021, Ryals's statements on social media, as well as his actions during the riot, demonstrate the need for specific deterrence for this defendant.   Ryals engaged in a course of conduct that numerous other Capitol riot defendants did not – he helped break down an office door within the Capitol. This is no "ordinary" Capitol riot defendant.   As time goes on, there will, inevitably, be political statements, occurrences, and events, for which Ryals will hold a difference of opinion.   Ryals must face consequences for his crime here so that it will not happen again.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro,
> comment 3.  More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval
> of Guidelines sentencing, through oversight of the Guidelines revision process.
> See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to
> the Guidelines).  Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.  Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original).   In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that

might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and

appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As

this Court knows, the government has charged a considerable number of persons with crimes

based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be

subjected to Guidelines analysis.  In order to reflect Congress's will—the same Congress that

served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of

consistency and fairness moving forward

**F.  The Need to Avoid Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Ryals and others like him committed on January 6 are unprecedented.  These crimes defy statutorily appropriate comparisons to obstruction-related conduct in other cases.  To try to mechanically compare other § 231 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.  Ryals is among the first wave of Capitol Riot defendants to plead guilty and be sentenced for a single count of 18 U.S.C. § 231(a)(3).  The Court may consider, for reference, the sentences imposed on Daniel and Darryl Johnson, 21-cr-407 (DLF), who were each sentenced on single counts of § 231(a)(3).  Like Ryals, the Johnsons—a father (Daryl) and son (Daniel)—participated in the storming of the Rotunda Doors, but the Johnsons were part of a larger mob of rioters assaulting police guarding those doors from the inside.  Here, Ryals had no qualms breaking down a door within the Capitol in his hunt for whatever he was looking for.

Additionally, while Daryl Johnson made chilling statements on social media about the riot, so did Ryals.  Daniel Johnson, who had a higher Guidelines range than his father due to his elevated criminal history category, was sentenced to four months' incarceration.  Daryl Johnson was sentenced to 30 days' incarceration.  A sentence of six months' incarceration for Ryals would not result in an unwarranted sentencing disparity for Capitol Riot defendants sentenced for violations of 18 U.S.C. § 231(a)(3).

This Court may also consider the sentence imposed on Nolan Cooke, 22-cr-52 (RCL).  Cooke, like Ryals, pleaded guilty to a single count of violating 18 U.S.C. § 231(a)(3).  While Cooke did not enter the Capitol building—which mitigates the nature and circumstances of his offense—he much more directly engaged with police officers both at the bike rack barriers and

near the Rotunda Doors, subjecting him to an additional three points for "physical contact" under the Sentencing Guidelines. *See* U.S.S.G. 2A2.4(b)(1)(A).  Thus, Cooke faced a higher Guidelines range—8-14 months as opposed to Ryals's 0-6 months.  Cooke ultimately received a sentence of 366 days incarceration.  Again, a sentence of six months' incarceration for Ryals would not result in an unwarranted sentencing disparity for Capitol Riot defendants sentenced for violations of 18 U.S.C. § 231(a)(3).

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Jerry Ryals to six months' incarceration, three years of supervised release, and $2000 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:    */s/ Jeffrey Q. McCarther*
JEFFREY Q. MCCARTHER
Assistant United States Attorney
Missouri Bar No. 62224
Detailee – Federal Major Crimes
U.S. Attorney's Office
District of Columbia
Jeffrey.McCarther@usdoj.gov
816.426.3122

28