<pre>
 1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2   _____

 3   United States of America,    ) Criminal Action
                                  ) No. 1:21-cr-00244-CKK
 4               Plaintiff,       )
                                  ) **Sentencing**
 5   vs.                          )
                                  )
 6   Jerry Ryals,                 ) Washington, D.C.
                                  ) **October 19, 2022**
 7               Defendant.       ) Time:  11:00 a.m.
     _____

 8                Transcript of Sentencing
 9                      Held Before
          The Honorable Colleen Kollar-Kotelly
10           United States Senior District Judge

11
                   A P P E A R A N C E S
12
     For the Government:    **Jeffrey McCarther**
13   (via Zoom)             UNITED STATES ATTORNEY'S OFFICE
                            400 East 9th Street, Suite 5510
14                          Kansas City, Missouri 64106

15   For the Defendant:     **Jay P. Mykytiuk**
                            SCROFANO LAW PC
16                          600 F Street, Northwest, Suite 300
                            Washington, D.C. 20004
17
     Also Present:          Amy Landon, Probation Officer
18   _____

19   Stenographic Official Court Reporter:
                            Nancy J. Meyer
20                          Registered Diplomate Reporter
                            Certified Realtime Reporter
21                          333 Constitution Avenue, Northwest
                            Washington, D.C. 20001
22                          202-354-3118

23

24

25
</pre>

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  Criminal Case 21-244, the

3   United States v. Jerry Ryals.

4          Counsel, would you please identify yourself for the

5   record, starting with the government.

6          MR. MCCARTHER:  Jeffrey McCarther on behalf of the

7   United States, Your Honor.

8          MR. MYKYTIUK:  And Jay Mykytiuk for Mr. Ryals.

9          THE COURT:  All right.  Let me just put on the record

10   that Mr. McCarther is on Zoom, which we had all agreed to,

11   since he's in Kansas; that he wouldn't need to come here.

12          Is it Jerry Ryals?  Am I pronouncing that correctly or

13   not?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Okay.  All right.  We're here for a

16   sentencing.  Mr. Ryals entered a plea to Count 1, civil

17   disorder, which is a felony.  The statutory maximum is

18   five years in jail, a fine of $250,000.  He has agreed to

19   restitution in the amount of $2,000.

20          He is compliant with his pretrial conditions.

21          I have a presentence report, a government sentencing

22   memorandum, the defendant's position on sentencing, 12 letters

23   that were written and provided to the Court in support of

24   Mr. Ryals, a video supplied by the government, and also a 302

25   note from the FBI regarding an interview that they held with

1    Mr. Ryals.

2         The -- I assume there's nothing else that has been

3    provided that I should have been looking at.  Everybody is

4    shaking their head no.  So I'm assuming that's correct.

5         Is that correct, Mr. McCarther?

6              MR. MCCARTHER:  Yes, Your Honor.

7              THE COURT:  Okay.  In terms of objections, the

8    objections that were associated in the presentence report

9    indicate that the government -- relating to paragraphs 26 and

10   27, indicated in summary form that an unspecified office space

11   in the Capitol -- that the government video shows the defendant

12   using his shoulders to push in a locked office door, and

13   there's a photo of him in the office.  The probation officer,

14   who wrote the report, indicated that that event that the

15   government wanted included was not in the statement of offense.

16   So the -- it was not changed in the report.

17        The other aspect of it was that the government -- that

18   the defendant told the FBI in an interview after the plea on

19   January 23rd that he denied breaking any doors in the Capitol.

20   Those were the two statements that are not in the statement of

21   offense.  So the probation officer did not change the

22   presentence report.

23        The government at that point asked for a variance, and

24   the probation department indicated that if there was one,

25   there -- the most would be an adjustment for acceptance of

1    responsibility.  Now, in the sentencing memorandum, the

2    government has agreed to the guideline without a variance and

3    includes the deduction for the two points for acceptance of

4    responsibility.

5         So I'm viewing the objections the government raised in

6    the context of the presentence report, in terms of whether to

7    change it, as resolved as to the government's objections.

8         Would that be accurate in terms of what would -- what

9    should be changed in the presentence report?

10             MR. MCCARTHER:  That would be accurate, Your Honor,

11   if the Court determines that Mr. Ryals should not get credit

12   for acceptance of responsibility.  I would note the six-month

13   request by the government is also part of the guideline that

14   would be in place if he did not receive acceptance of

15   responsibility.  I believe the guideline would become 6 to

16   12 months.

17             THE COURT:  Okay.  I --

18             (Indiscernible simultaneous cross-talk.)

19             MR. MCCARTHER:  -- determined 6 months was the

20   appropriate ask.

21             THE COURT:  Okay.  I just wanted to make sure that we

22   didn't need to get into changing the presentence report.  It

23   stays the way it is.  The information is outside of the

24   statement of offense, and you're not asking for a change to the

25   presentence report, as I understand it.

1          MR. MCCARTHER:  Yes, Your Honor.

2          THE COURT:  That doesn't mean you can't argue things,

3     but it --

4          All right.  So based on that, according to the

5     presentence report and what the probation officer put together

6     is the offense level, the base offense would be 10; 2 points

7     for acceptance of responsibility; would be a total offense

8     level of 8.  He has no convictions.  So he'd be in Criminal

9     History Category I.

10         And so an Offense Level 8, Criminal History Category I,

11    the guideline for custody is zero to six months.  Supervised

12    release is one to three years.  Probation is one to five years.

13    The fine range would be 2,000 to 20,000.  He has agreed to

14    restitution in the amount of 2,000, and there is a special

15    assessment of a hundred dollars.  So as presently written, I

16    will adopt the presentence report.

17         Since the presentence report is actually undisputed,

18    based on the government's not requesting for a change within

19    the presentence report, I would say the objections are

20    withdrawn, abandoned.  I'm accepting all portions of this

21    undisputed presentence report as findings of fact under

22    Federal Rule of Criminal Procedure 32(i)(3)(A).

23         So I'll now hear from the government and then defense

24    counsel and then the defendant, if he wishes to address the

25    Court.

1          All right.  So --

2              MR. MCCARTHER:  Thank you, Your Honor.

3          I won't belabor the points made in the government's

4     sentencing memo, but on January 6th, 2021, Mr. Ryals came to

5     the U.S. Capitol with one goal in mind, and that was to disrupt

6     the certification of the 2020 presidential election for no

7     other reason than he wanted the other candidate to have won.

8     Mr. Ryals committed himself so ardently to this cause that he

9     found himself illegally trespassing on the grounds of the

10    U.S. Capitol with the mob, marching up the stairs against tear

11    gas, surrounded by skirmishes amongst the mob with the Capitol

12    Police.

13         Walking into the Capitol with shards of broken glass

14    from doors and windows despite calls from law enforcement for

15    him to leave.  Mr. Ryals's belief found himself lowering his

16    shoulder to break down the office door previously referenced.

17    What we can't be certain of is what or whom he may have been

18    looking for and what he intended to do if he found them.

19         Mr. Ryals was sure to take and post photos, however,

20    while inside that unspecified office space.  He left, came back

21    in the Capitol, left and came back in yet again.  During his

22    time inside the Capitol, he traveled to various areas and

23    participated in chants of "USA.  USA."  In the wake of this

24    riot, the next day, Mr. Ryals claimed on a Facebook post that

25    things in America were heading towards a new revolutionary war

1    and that himself and the others participating in the riot were

2    patriots.

3           When considering the 3553 factors, several stand out;

4    the first being the nature and circumstances of this offense,

5    and that includes, of course, the breaking down of a locked

6    door by Mr. Ryals.

7           The second 3553 factor that stands out is the

8    seriousness of this offense and why the sentence must reflect

9    the seriousness of the offense for which Mr. Ryals

10   participated; that is, committing himself to a riot that

11   included the destruction of property and various other offenses

12   committed that day.

13          The third is deterrence.  Without question, there are

14   going to be numerous election results in the future that many,

15   including Mr. Ryals, are going to disagree with.  The sentence

16   should deter not only Mr. Ryals but others from taking similar

17   actions as those actions taken on January 6th, 2021.

18          For all of those reasons, and in conjunction with the

19   government's sentencing memo, the United States is recommending

20   a top of the guideline sentence at six months' incarceration,

21   three years of supervised release, and $2,000 in restitution.

22          Thank you, Your Honor.

23          THE COURT:  All right.  Defense counsel.

24          MR. MYKYTIUK:  Thank you, Your Honor.

25          It is tempting for defense attorneys in these cases --

1          THE COURT:  Can I ask you to move closer to -- the

2     microphone, you have to talk right into the head in order to

3     get the full volume.

4          MR. MYKYTIUK:  Yes, Your Honor.

5          It's tempting for defense attorneys in these cases,

6     and -- and present company included, to throw a lot of the

7     blame on the events of January 6th to our elected officials.

8     Not just the elected officials, but the mouthpieces and the

9     media that -- that echoed this insistence that the election --

10    2020 election had been stolen by the Democrats.  This certainly

11    happened.  President Trump certainly -- and I think anybody

12    who's paid any attention knows that he -- he's stated this over

13    and over again and continues to say it over and over again.

14         And at the time after the election, you couldn't -- you

15    couldn't turn on a television set without hearing this echoed.

16    So it's tempting to -- to want to blame these demagogues for

17    the actions of the people that did come to the Capitol and

18    breach the Capitol on January 6th.  And even in my sentencing

19    memo, I certainly lay some foundation there.  But the truth is,

20    while they may have lit the match, the fire was certainly

21    stoked by the people that showed up to the Capitol on that day.

22         And Mr. Ryals, when I showed him an initial draft of my

23    sentencing memo, he asked me to change it because he didn't

24    place all of the blame on -- on everyone who was making this

25    claim.  He didn't want to use them as a scapegoat because he

1      wanted to take responsibility for his own actions, and he

2      certainly does on that day.  I also understand that we all have

3      free will and everyone who did come to the Capitol on that day

4      did so whether or not they were encouraged to by others.  They

5      did so because that's what they chose to do.

6            Now, I probably, to be honest with you, do not agree

7      with Mr. Ryals on -- on many things that have to do with

8      politics.  Maybe nothing.  But in the time -- in the two years

9      that this case has been pending, I have gotten to know

10     Mr. Ryals.  And if we -- if I didn't know what he had done and

11     if I didn't know what his political views were, I would have

12     been very surprised that Mr. Ryals found himself ever facing

13     sentencing in a federal court.

14            I submitted with my sentencing memos 12 letters from

15     friends and family, and the theme is -- is the same.  He's a

16     kind and generous man who has been -- who has contributed to --

17     to his family, who has contributed to his community.  And it is

18     difficult to reconcile, and I'm sure in other cases -- in the

19     800-plus other cases that have -- have come here, it's tough to

20     reconcile some of the defendants' action --

21            THE COURT:  Excuse me a minute.

22     You need to put a mask on.

23     Go ahead.

24        MR. MYKYTIUK:  -- with -- with who they are.

25            And I think Mr. Ryals is -- is a perfect example of

1    that.

2         There are three -- in my mind, there are three groups of

3    defendants that showed up to the Capitol on January 6th.  There

4    are -- I think that -- that time has borne out that there

5    certainly was an organized effort by some groups to come to the

6    Capitol to -- to disrupt the count, to take the Capitol by

7    force.  They were dressed in riot gear.  Some of them came

8    armed.  They were prepared for a riot, for an overthrow.  That

9    is one group.

10        There is another group that while there went with the

11   mob, and they had no limits on their behavior, no restraints,

12   and they -- they exercised violence against Capitol Police,

13   and -- and other -- other people that were there to prevent the

14   Capitol from being taken.

15        And then I believe there is a third group of defendants,

16   who Mr. Ryals falls in.  A group that was there to see a

17   speech, that did not travel to the Capitol to disrupt any

18   count, but was angry and did believe that something untoward

19   had happened in that election; came to the Capitol to hear the

20   speech and then followed the mob and -- and participated in

21   some of the activities but drew lines at being the first people

22   in the Capitol, pushing against police lines, at -- at --

23   having violent interactions with the police.  And, again, I

24   think that -- that is Mr. Ryals.

25        That being said, this is troubling, and -- and that day

1    is going to be troubling on many levels and will be written

2    about and talked about throughout this nation's history for as

3    long as it lasts.  And Mr. Ryals, certainly, was part of that,

4    and he has not gone unscathed even thus far.  He is now a felon

5    conviction -- you know, he is a felon.  He has -- he's going to

6    lose certain cherished rights.  He has already lost a job.

7    These events has caused the estrangement with his wife and

8    limited the time that he has been able to -- to see his son.

9    There have been consequences even before we -- we came in here

10   today.

11          I understand the government talking about deterrence and

12   preventing this in the future, and I completely agree with

13   that.  But, again, there are three levels of defendants.  And

14   Mr. Ryals, I believe, is -- is in that third level that does

15   not need active jail time to act as a deterrent.

16          One of the factors that the Court should consider and

17   must consider is disparity in sentencing.  And I think that

18   there -- for this particular charge, there is more of a limited

19   sample size than -- than on some of the other charges that have

20   been -- that have gone to sentencing.  But as I did in my

21   sentencing memo, I want to direct the Court to one of the

22   defendants that was sentenced for this charge, and that is

23   Daryl Johnson in Case 21-cr-407.  Mr. Johnson was, this summer,

24   given a sentence of 30 days of active jail time on -- on his

25   charge of -- of this -- this same charge.

1       But if one compares the facts of Mr. Johnson's case with

2   Mr. Ryals's case, I believe that the sentence that Mr. Ryals

3   should receive -- to be consistent with Mr. Johnson should be

4   less than 30 days.  Mr. Johnson, unlike Mr. Ryals, actually

5   rushed a line of law enforcement officers, and he helped push

6   through the officers, and he pushed open the east Rotunda

7   doors.  And I'm -- I'm getting this from the -- the statement

8   of facts that -- that the government wrote up and that they

9   agreed to.

10      In addition, his postings following the Capitol riots,

11  he references that -- he says that there will be hangings on

12  the front lawn of the Capitol.  He says that it's going to get

13  ugly and probably result in some version of a civil war.  And

14  he says, quote, I have no problem dying in a pool of empty

15  shell casings.  That's Daryl Johnson who was sentenced to

16  30 days in jail.

17      You compare -- I understand Mr. Ryals said things

18  certainly at the time and certainly after, but they do not

19  rise, I believe, to the level of what you heard from

20  Mr. Johnson.  In addition, Mr. Ryals -- and there's no dispute

21  here.  He came into the Capitol after the doors had been

22  opened.  He did not push against -- push against the line.  He

23  did not have any physical interaction with -- with officers.

24  The -- he wandered around for a lot.  He had -- he took

25  selfies.  He was -- he was a tourist.

1        Now, the one caveat is there is a video of

2    Mr. Johnson [sic], along with another person, opening that

3    office door, breaking -- breaking down that office door.

4    When -- I say breaching.  I don't think there's actually been

5    an indication that there was damage done to the door, but the

6    door was opened by Mr. Ryals.  He had come upon the door when

7    other people were already trying to open, and like he had

8    already done on his way into the Capitol is he -- he joined the

9    crowd.  He should have exercised better discretion.  He should

10   have exercised that before he even got to the Capitol steps,

11   but Mr. Ryals is acknowledging the mistakes that he's made.

12       He has no criminal history.  He has been on release in

13   this case.  For -- for approximately two years, I think, he has

14   been in compliance.  I -- I think when the Court is fashioning

15   sentence, it should take all of that into account.  And, again,

16   I think the touchstone for -- for sentencing disparity should

17   be Mr. Daryl Johnson.  And -- and based on that, I would ask

18   the Court to sentence Mr. Ryals to a period of probation

19   without incarceration.

20            THE COURT:  All right.  Mr. Ryals, do you -- is there

21   something you wish to say?

22            THE DEFENDANT:  Yes, Your Honor.

23       Your Honorable Kollar-Kotelly, between working and

24   raising my son, I've had much time to reflect, time to think

25   about my actions, time to think about what I've done wrong and

1   how it's affected so many different people, so many different

2   aspects of my life.  Never in my life did I ever want to cause

3   hurt or pain to anybody.  And that's one of the things that

4   hurts most about my decision that I made that day.  And I've

5   done a disservice to those that I represent.  And for that,

6   Your Honor, I am very remorseful.

7        I'm a man who believes in what is right and what is

8   just, and I'm willing to accept any consequences for my actions

9   and any judgments you set forth.  It has been nearly two years

10  since that day, and one of the many lessons I learned

11  throughout the process is that so many things in life are taken

12  for granted, and I can't help but to think about how my

13  decisions will affect my future, my family, and my country.

14       You have every right to see me as a criminal, but

15  there's nothing I want more to make amends and to get on with

16  my life.  And having learned from my mistake, getting caught up

17  in the heat of the moment, and my lapse of judgment, this will

18  forever be a mark that can never be washed away.  I only ask,

19  Your Honor, to see me as the man that my friends and family see

20  me as and have known for my whole life and not see me for the

21  mistake that I have made.

22       Thank you, Your Honor.

23            THE COURT:  I have a question that I would ask both

24  you and counsel.  I did receive the 302 from the FBI, and

25  although it indicates -- and it's a statement that they've

1    written down -- is there anything that you think is wrong in it

2    at this point?  And in an early part of the statement, it says

3    that Mr. Ryals said he walked into an office.  It omits

4    anything about breaking down the door.  And, in fact, it says,

5    at one point Mr. Ryals never breached any closed doors or

6    assisted others with the breaching of any doors inside the

7    Capitol.

8         Is that correct, that that's what he said to the FBI?

9    Is that true?

10        MR. MYKYTIUK:  Your Honor, from my part -- so I --

11   this interview was done post-plea.

12        THE COURT:  Right.  I understand.

13        MR. MYKYTIUK:  And he -- it was done in person with

14   Mr. Ryals in Oklahoma.  I appeared by telephone.  To be

15   perfectly honest with you, once I received this report, I had

16   not remembered that question being answered.  Also at that

17   point, I -- you know, we certainly weren't aware that there was

18   evidence of this happening.  So I cannot honestly say if that

19   was the conversation, but Mr. Ryals --

20        THE COURT:  Okay.  Well, Mr. -- let me ask Mr. Ryals.

21   Is that what you said?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  Okay.  So you denied when you talked to

24   the FBI back in June of 2022 that you had actually breached the

25   door; is that correct?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  What I'd like to do is to

3    take a 15-minute break.  I want to go through the information

4    that I have, and then I'll come out and do the sentencing.

5          Okay.  I'll call in to Ms. Patterson and let her know

6    that I'm coming out.

7          THE DEFENDANT:  Thank you, Your Honor.

8          THE COURT:  Let me take a few minutes based on the

9    information that I have.

10          (Recess taken.)

11          THE COURT:  All right.  Let me proceed with the

12    sentencing.  I have to say that probably one of the most

13    difficult -- please, you can go ahead and sit down.  He doesn't

14    need to stand.

15          Probably one of the most difficult tasks that a judge

16    has is to do a sentencing.  So it's always difficult to

17    determine all the factors and to make judgments about people

18    and what potentially they'll do in the future, but let me

19    proceed.

20          In addition to the advisory sentencing guidelines, the

21    Court considers the pleadings, arguments, record in this case,

22    in addition to the following information in determining a fair,

23    appropriate, and reasonable sentence, in conformance with the

24    factors set out in 18 U.S.C. 3553(a) and subsequent sections,

25    except for (e).

1    Mr. Ryals is 27 years old.  He has no criminal history.

2    In terms of education, he's a high school graduate.  He does

3    have some college.  He's completing an on-site apprenticeship

4    to get an electrician's license.  He's starting with a

5    journeyman's card.

6         In terms of job history, from February 2020 to

7    March 21st -- no.  From February of 2020 to March of 2021 and

8    then July of 2022 to the present, he's worked for his

9    co-defendant, Tony's Electric & Remodeling.  Prior to that he

10   had contact with -- a contract -- excuse me -- with a hospital.

11   He lost the job because of this case.  He and the co-defendant,

12   however, are doing independent jobs.  From March of 2021 until

13   April of 2022, he worked for Renfro Electric.  He was laid off.

14   There's a past history of work as a car salesman, restaurant

15   cook, landscape, and warehouse worker.

16        In terms of finance, he does have assets, income.  He

17   does have positive monthly cash flow.  He does need to pay

18   restitution, and he has support responsibilities for his son.

19   He, evidently, will be going through a divorce proceeding once

20   financially the couple is able to.  So I'll find there's no

21   financial availability to pay an additional fine beyond the

22   restitution and whatever his responsibilities are for child

23   support.

24        In terms of mental health and emotional, there's no

25   issues at this point.  Substance abuse, evidently in use of

1    alcohol, marijuana.  For marijuana he does have a medical card;

2    hasn't used it since 2020.  Evidently, in high school he tried

3    mushrooms and acid but hasn't used it since.

4        Physical condition, no issues.  No COVID vaccine.

5        On a personal and family basis history, he was born into

6    an intact family in Oklahoma.  Parents separated when the

7    defendant was around 9 years old.  Father in landscaping.  His

8    mother eventually remarried in 2005, and she is a homemaker

9    living in South -- she was -- is a homemaker living in

10   South Carolina.  The defendant has an older sister.  After the

11   parents' separation, evidently Mr. Ryals lived with his mother

12   and his sister lived with his father.  He does have a

13   stepfather who owns a software company.  The defendant and the

14   stepfather get along.  The defendant moved with his mother and

15   stepfather to Michigan, and then in 2013 they moved to

16   Oklahoma.

17       In January 2019 Mr. Ryals got married.  He evidently

18   separated in 2022.  Evidently, they already had some issues in

19   the marital relationship, but this seems to have contributed or

20   exacerbated their relationship.  He does have one child.  The

21   probation office indicated he was 2 years old.  Is he 2 or 3?

22           THE DEFENDANT:  He turned 3 in September, Your Honor.

23           THE COURT:  Okay.  So he's now 3 years old.  And he

24   lives with his mother.  The defendant does see his son, spends

25   time with him, and is financially supporting him.

1            In terms of the statement of offense and -- I will read

2      the portion that relates specifically to -- from the statement

3      of offense as opposed to my summary summarizing it, although I

4      may pick out certain aspects of it.  But reading from what he

5      signed and agreed to, on January 5th, 2021, Mr. Ryals drove

6      himself and two other individuals, including the co-defendant,

7      Anthony Griffin, from Oklahoma to a hotel outside of D.C. in

8      Virginia.

9            On the morning of January 26th [sic], 2012, Mr. Ryals

10     and the two other individuals traveled to D.C. to attend the

11     "Stop the Steal" rally.  He attended the rally to protest the

12     results from the 2020 presidential election.  Mr. Ryals wore a

13     red 2020 Trump hat to the rally.  He also wore a

14     charcoal-colored jacket and blue jeans.  The description is

15     important in terms of looking at the videos.

16            After the speeches, however, Mr. Ryals walked with the

17     crowd towards the U.S. Capitol.  He later described the scene

18     outside the Capitol as one in which the Capitol Police were

19     throwing percussion grenades, using pepper spray, and shooting

20     rubber bullets from the Capitol steps.  They were, obviously,

21     trying to keep people out.

22            At this point Mr. Ryals filmed a video with his phone

23     from the bottom of the Capitol steps.  The video showed

24     multiple people standing on the Capitol steps, and in the

25     video, Mr. Ryals states, quote, They're tear gassing, throwing

1    flash bangs, pepper spray, but we will not concede, unquote.

2    Additionally, the Capitol Police, through verbal directives,

3    were ordering people away from the Capitol.  Mr. Ryals saw the

4    crowd shift and started going up the stairs with people in the

5    crowd yelling, "Come on."  Mr. Ryals began going up the stairs

6    with the crowd.

7         Mr. Ryals knew it was a bad idea to go inside the

8    Capitol, so briefly retreated back down the steps, but

9    ultimately decided to continue toward the Capitol doors.  At

10   some point just before entering, Mr. Ryals filmed a video with

11   his phone from the Capitol steps.  The video showed multiple

12   people standing outside the Capitol, multiple people entering

13   the Capitol.  In the video, Ryals states, quote, We definitely

14   have enough people to overthrow this bitch -- presumably the

15   government.  They -- referring to law enforcement -- don't

16   stand a fucking chance.  We got the fucking doors open up

17   there, I guess.  We're working our way in slowly but surely.

18   And then Mr. Ryals entered through a side door.

19        Mr. Ryals remained inside of the Capitol for

20   approximately 10 to 15 minutes, remaining primarily in an

21   unspecified office space.  As he made his way to other parts of

22   the Capitol, he and others were confronted by several

23   Capitol Police officers who directed them back outside through

24   the same door he entered.

25        Mr. Ryals remained back outside for 5, 10 minutes, then

1    returned to the side door and entered.  The Capitol riot police

2    were in the hallway inside the door ordering and pushing people

3    out of the Capitol.  At some point the police began shooting

4    pepper balls at the crowd, and he was struck in the shoulder

5    with one.

6         Despite orders from the Capitol Police to leave,

7    Mr. Ryals reentered the Capitol through a set of double doors.

8    Mr. Ryals walked through and remained in several areas on the

9    multiple floors of the Capitol, including the Rotunda and the

10   Crypt.  Mr. Ryals spent approximately 30 minutes inside the

11   Capitol after his reentry, taking photos and video while

12   inside.

13        Mr. Ryals exited the Capitol but remained on the

14   grounds.  At approximately 6:30 p.m., Mr. Ryals and

15   Co-Defendant Griffin returned to their vehicle where they met

16   with the other individuals they had come with.  They returned

17   to their hotel in Virginia, and they all drove back to Oklahoma

18   the next morning.

19        At some point on January 7, 2021, Mr. Ryals posted the

20   following message on his Facebook account:  Where we go we --

21   where we go one, we go all, and yesterday was a monumental day

22   in history.  Millions of Trump supporters lined out -- lined

23   out by the Washington Monument to hear Trump, and after minutes

24   of his speech, before he had even gotten started, the patriots

25   walked down towards Capitol Hill to "Stop the Steal."  We

1    reclaimed our Capitol just to be slandered by the media pushing

2    this great reset agenda and who have their hands in the CCP's

3    pockets.

4        I just ask that -- American people to wake up if you

5    haven't already.  Things are headed in the direction of

6    revolutionary war against the corruption in our government.

7    The media labeled us as, quote, barbarians; yet every person I

8    talked to today was a good-hearted Christian who all said

9    they've never really gone to any rally, protest, or anything

10   like what they did today.  Seeing millions of patriots covering

11   the streets from Capitol Hill to the Washington Monument on

12   both streets, sidewalk to sidewalk, showing the true nature of

13   the American spirit, and this corruption can go on no longer.

14       It is our responsibility to handle this at all costs.

15   We are not animals.  We are not barbarians.  We are the heart

16   of this country and the last ones to stand up for your freedom.

17   Then it has a #Godblessamerica, #Trump2020Landslide

18   #nomorebullshit #Freedom.

19       For purposes of the statement, Mr. Ryals further admits

20   that on January 6th, 2021, he knowingly proceeded up the stairs

21   of the U.S. Capitol, entered, exited after being told to leave

22   by law enforcement officers, reentered at another door, and was

23   forced out by the law enforcement officers.

24       Mr. Ryals then reentered the U.S. Capitol restricted

25   building and remained for approximately 30 minutes.  Ryals

1   admits these actions impeded and interfered with law

2   enforcement officers engaged in official duties, including but

3   not limited to protection and security of the U.S. Capitol.

4   Ryals also admits that on January 6th, 2021, on the grounds of

5   the U.S. Capitol, numerous law enforcement officers with the

6   Capitol Police were engaged in the performance of federally

7   protected functions during the commission of a civil disorder;

8   namely, a riot.  Mr. Ryals admits that the civil disorder on

9   January 6th, 2021, obstructed and adversely affected the

10  Capitol Police's performance of those federally protected

11  functions.

12      Now, Mr. Ryals has submitted letters in support.

13  They're from family, friends, employers, and a family attorney.

14  Mr. Ryals is described as, quote, a gentle giant who was

15  willing to spend time with a 12-year-old autistic twins when

16  the defendant was a teenager, and ordinarily teenagers would

17  not want to spend time with others younger than themselves,

18  nonverbal; so certainly that was a commendable action on your

19  part.

20      He's also described as a caring parent of his now

21  3-year-old son, hardworking, respectful.  He has been involved

22  in treating the lawns at Arlington National Cemetery on a

23  yearly basis.

24      He's been compliant with his pretrial conditions over

25  the past two years.  He has no criminal history.  He did not

1    assault any law enforcement officers on that day.  Today he's

2    expressed remorse, and today he was honest about what he told

3    the FBI when he made certain denials.

4         In looking at the video, it shows the following -- and

5    this is described -- specifically, Exhibit 3, which is --

6    although I looked at all of them, I would describe this one

7    specifically.  What you see is the inside of the Capitol after

8    you go in the parliamentarian door, which is on the northwest

9    side.  You see a tile floor corridor.  You then -- it's empty.

10   Then you see police move up to the door.  You cannot see the

11   door on the video.  The crowd rushes in.  The law enforcement

12   moves back.  The defendant is not pushing the law enforcement,

13   but he certainly is in front with the crowd as it -- the crowd

14   pushes the law enforcement back down the corridor.

15        On the left side is a door to a senator's inner office.

16   It's locked.  A rioter tries to start to force the locked door

17   open; tries about six times and is using, at one point, a sign.

18   It's a standing sign that's on a metal -- metal post, and that

19   is used to try and break down the door, sort of as a battering

20   ram.

21        The defendant then joins in with the others.  There's at

22   least four pushes at this point to open it.  The defendant then

23   uses the sign four more times trying to breach the door.  The

24   sign then breaks.  The defendant then starts using his

25   shoulder, slamming against the door eight separate times.

1    Eventually, the door is breached.  The office is unoccupied.  I

2    have to say the defendant was certainly persistent in breaking

3    down the door to a, obviously, private office.  He goes in.  He

4    then comes out of the office.  While he's in there, he's taken

5    at least one selfie of himself in the office.

6          While he's outside, he's encouraging other people to go

7    in once the door is open.  And you can see him chanting USA.

8    He then noses around the hall and then leaves.  And this is in

9    the one video.  So there were other videos, as I've described,

10   in terms of his in and out of the Capitol, but this is in the

11   one section.  I have to say, you see him today and you see him

12   on the video; and, admittedly, he's a very different person.

13   But I can't ignore the Mr. Ryals on the video.

14          In terms of looking at the 3553 factors, this is a

15   serious offense.  Mr. Ryals participated in an insurrection.

16   He walked to the outside of the Capitol.  He saw law

17   enforcement officers trying to keep this massive crowd from

18   going up the Capitol steps.  He recognizes he shouldn't be

19   involved in breaking the -- breaking into the Capitol.

20          When rioters pushed past and went up the stairs, he then

21   joined them.  He tellingly says, quote, We have enough people

22   to overthrow this bitch.  Presumably the government.  They,

23   referring to law enforcement, don't have a chance.  We got

24   doors open, working our way in the Capitol, slowly but surely.

25          He's in the Capitol for the 10 or 15 minutes.  Capitol

1    Police confront him.  They direct him to leave.  He leaves.  He

2    then reenters.  He's ordered out again.  Comes back in again,

3    and then is there for about 30 minutes.  He takes photos on his

4    phone, and videos.  He indicates, quote, We reclaimed our

5    Capitol, unquote.  I would point out by force and by violence.

6         The video -- although it's not in the statement, as I've

7    indicated already, you can see he's near the rioters trying to

8    open a locked door using an entrance sign, uses his shoulder,

9    and he uses the entrance sign, until it breaks, as a battering

10   ram.  Others joined him with the broken door and entered the

11   empty office.  Whatever his exact purpose, it certainly wasn't

12   benign.  This isn't conduct he should have engaged in.  Clearly

13   it was a private office.  It was locked.

14        Now, looking at the FBI report, which is something -- he

15   had an interview five months later.  So he's had some time to

16   think about what he engaged in.  He denied doing -- doing --

17   you know, doing this breach of the door, which was not -- which

18   took some time between his shoulders, aiding others -- and the

19   shoulders, he's there doing it himself -- using the sign until

20   it breaks.

21        Now, granted he admitted today that he told the FBI

22   five months after the riot that he didn't participate in

23   breaking down the door, but the video makes it very clear he

24   did.  But he was dishonest with the FBI five months later as to

25   what his actions are.  He just walked into the office.

1          So I -- and I would point out a couple of things in

2     terms of the statement.  He indicates -- you know, he walked in

3     the office.  He talks about that he never breached any closed

4     doors, which is not true, or assisted others with the breaching

5     of any doors inside the Capitol, also dishonest.  Never had any

6     plans to overthrow the government, nor did he have any

7     intentions of conspiring against the government.  He only was

8     there to support Trump.  Now, obviously, his statements would

9     belie that.

10         He may be known by his friends and family as a gentle

11    giant, but there was nothing gentle about his action on

12    January 6th.  He's also known as being respectful of others.

13    His actions did not reflect a respect for the rule of law on

14    January 6th.  As I said, he told the FBI he wasn't involved in

15    the insurrection, but I -- and I emphasize this because I think

16    this is important.  But he stated these statements that I've

17    just gone over.  He participated in an insurrection, and it

18    certainly wasn't a peaceful one.  We definitely have enough

19    people to overthrow the bitch; which is clearly the government.

20    They didn't stand a chance; talking about the law enforcement.

21    We reclaimed our Capitol.  Things are headed in the direction

22    of a revolutionary war against the corruption in our

23    government.  These are not peaceful comments and clearly

24    contradict what he told the FBI five months later.

25         Clearly, his goal was to stop the certification of the

1    presidential election and peaceful transfer of power as

2    guaranteed by our Constitution.  Your actions and participation

3    in the mob helped create the momentum of violence by you and

4    others participating in the insurrection.  That provided safety

5    for the violent actions of others.  Even if you didn't hit a

6    law enforcement officer, others did, and you were there and

7    encouraging them, gave them cover to do that.

8         Violence is an unacceptable way to resolve political

9    differences, which is what this is.  There are lawful means

10   available in a democracy to change or challenge actions you

11   disagree with, which do not include a violent insurrection.

12   Your presence and actions by joining other insurrectionists was

13   an inexcusable attack on our democracy and the peaceful

14   transfer of power according to the Constitution; and certainly

15   a disrespect of the rule of law, which governs civilized

16   societies.

17        You should appreciate what an extraordinary country you

18   live in, with a vibrant democracy, which can easily be

19   destroyed.  You should appreciate how lucky you are to live in

20   this democracy as opposed to living in some country ruled by an

21   authoritarian.

22        Now, there are consequences to you personally having

23   engaged -- which is true of all criminal conduct.  Having

24   engaged in this criminal conduct, you lost your job.  It's

25   probably going to affect future employment based on the fact

1    it's a felony.  You lost certain civil rights.  It's evidently

2    exacerbated your marital relationship, made it more difficult

3    for you to spend time with your son, and you may have regrets

4    today because of how it's affected you.

5          My concern is deterrence to you in the future.  We're

6    going to have other elections coming up, and they are,

7    obviously, going to be very volatile, and it's -- looking at

8    the news, it sounds to me, in listening to different people who

9    are on the ballots to be elected, that this is going to not be

10   an easy election and it's going to be very controversial and,

11   in many instances, very close in terms of votes.

12         So the question is what is your response going to be?

13   You did not accept responsibility five months later after the

14   event, when you would have had time to think about it, when you

15   interviewed with the FBI.  That concerns me.  You destroyed

16   property trying to enter a private office.  Who knows what your

17   purpose was.  Certainly not a good one.  The statements you

18   made clearly in support of goals of an insurrection and

19   revolutionary war, can you be trusted when you're dishonest

20   about this insurrection in your actions?

21         There's also a concern, frankly, about deterrence to

22   others in the future when we have future elections, which are

23   coming up, and that is also an essential consideration for

24   people to understand -- not only you, but others if they're

25   contemplating doing this; that there are consequences to them.

1    And something, hopefully, that will give them thought before

2    they act.

3         Now, looking at parity, which is something that is

4    important, there is the *Johnson* case, which you've cited, and I

5    have looked at that.  There's other cases, and there's a whole

6    different series of cases.  There is not total parity between

7    all of the judges and how they've been handled, frankly.  I've

8    looked at it in -- I've been keeping track of my own cases in

9    terms of misdemeanors or a felony, you know, in terms of

10   whether there's been -- they've been involved in violence, what

11   kind of statements have been made.  Frankly, in the admissions

12   or honesty about people's actions.

13        If you look at another case, which is *U.S. v. Simon*, in

14   that particular case, somewhat similar, although it was violent

15   acts or something -- if you look at the statement of offense,

16   it doesn't appear to have anything where, you know, the person

17   is, you know, beating up law enforcement.  And it was a

18   misdemeanant.  So it was eight months.  Now, that was a

19   different judge.

20        This is not just -- it's an offense of civil disorder,

21   but it's not the typical, you know, people going out

22   specifically in -- you know, a protest, engaged in some civil

23   disorder.  I mean, this is the worst expression of a civil

24   disorder in terms of conduct.  It's an insurrection.  It's a

25   disruption of the peaceful transfer of power; and we've had,

1    over the years, difficult, contentious, and, frankly, disputed

2    transfers of power.  But we have not acted and engaged in

3    insurrections in response to them.  And so, you know, none of

4    them have been these difficult transfers that have been

5    disputed.  None of them have been involved in this kind of

6    conduct.

7           So, frankly, I think a term of imprisonment as opposed

8    to a probation is a just punishment and deterrent.

9           Now, I've also looked in terms of the cases I have.  So

10   I've been doing more parity with my own cases.  I have

11   misdemeanants where, you know, it's zero to six months, and the

12   maximum appropriately, frankly, is six months.  Here we have

13   the defendant charged as a felony, and we -- the sentence would

14   be the same as a misdemeanant.  There's something wrong with

15   that.

16          And I -- my biggest concern here is that you did not

17   accept responsibility after the plea and you were dishonest in

18   your interview with the FBI.  You were not truthful, and it's

19   five months later where you've had plenty of time to think

20   about this.  Now, granted today, you did own up to it.  I'm

21   assuming you've looked at those videos and it's hard to claim

22   you weren't involved in breaking down that door.

23          So I -- from my perspective, I think you have not

24   actually accepted responsibility for your acts.  So I am going

25   to take away the two points for acceptance of responsibility.

1    I think your actions have been dishonest, and I think that

2    raises a question for me, both accepting responsibility and,

3    frankly, deterrence in terms of making sure this doesn't happen

4    again.

5           So looking at the factors, you know, just punishment,

6    deterrence to you, to others.  It's my hope that the sentence,

7    which I'm going to impose in a moment, sends a message to you

8    to deter you and others from ever engaging in this type of

9    disruptive behavior in the future and that you admit and

10   recognize you live in a country within comparable freedoms

11   which are protected by the rule of law.  And a democracy is

12   fragile, and it requires that all citizens appreciate it.  You

13   eliminate the rule of law and you jeopardize those freedoms.

14          In terms of the sentence, pursuant to the Sentencing

15   Reform Act of 1984 and in consideration of the provisions of

16   18 U.S.C. 3553(a), as well as the advisory sentencing

17   guidelines, it is the judgment of the Court that you,

18   Jerry Ryals, are hereby committed to the custody of the

19   Bureau of Prisons for a term of nine months of incarceration as

20   to Count 1.

21          You're further sentenced to serve a 36-month, 3-year,

22   term of supervised release as to Count 1.

23          In addition, you're ordered to pay a special assessment

24   of a hundred dollars in accordance with 18 U.S.C. § 3013.

25          While on supervision, you shall abide by the following

1    mandatory conditions, as well as the standard conditions of

2    supervision, which are imposed to establish the basic

3    expectations for your conduct while on supervision.  The

4    mandatory conditions include:

5         One, you must not commit another federal, state, or

6    local crime.

7         Two, you must not unlawfully possess a controlled

8    substance.

9         Three, you must refrain from any unlawful use of a

10   controlled substance.  You must submit to one drug test within

11   15 days of placement on supervision and at least two periodic

12   drug tests thereafter as determined by the Court.

13        Four, you must cooperate in the collection of DNA as

14   directed by the probation officer.

15        You must make restitution in accordance with

16   18 U.S.C. §§ 36 through 63 and 3663(a) or any other authorizing

17   a sentence of restitution.

18        You shall comply with the following special conditions:

19        Financial payment.  You must pay the financial penalty

20   in accordance with the schedule of payments sheet of the

21   judgment.  You must also notify the Court of any change in

22   economic circumstances that might affect the ability to pay

23   this financial penalty.  And the financial penalty is really

24   the restitution and the hundred dollars.  There's nothing else.

25        Financial payments schedule.  Having assessed your

1    ability to pay, payment of the total criminal monetary

2    penalties is due as follows:  $75 a month over a period of

3    35 months, to commence after the date of this judgment.  I'm

4    assuming that you can pay $75.

5            Financial information disclosure.  You must provide the

6    probation officer access until your financial obligations have

7    been satisfied to any requested financial information and

8    authorize the release of any financial information.  The

9    probation office may share financial information with the

10   U.S. Attorney's Office.

11           Financial restrictions.  You must not incur new credit

12   charges or open additional lines of credit without the approval

13   of the probation office while there are outstanding financial

14   obligations.

15           I'm going to set a reentry progress hearing.  Within

16   60 days of release from incarceration, you'll appear before the

17   Court for a reentry progress report -- hearing.  The probation

18   office in the district you're supervised will submit a progress

19   report to the Court within 30 days of the commencement of

20   supervision.  Upon receipt of the progress report, I'll decide

21   whether your appearance is required.

22           The Court finds you don't have the ability to pay a fine

23   and, therefore, waives the imposition of a fine in this case.

24           You're ordered to make restitution to the Architect of

25   the Capitol in the amount of $2,000.  The Court determined that

1    you don't have the ability to pay interest, waives any interest

2    or penalties that could accrue on the balance.  Restitution

3    payments shall be made to the Clerk of the Court in the

4    U.S. District Court in the District of Columbia for

5    disbursement.  It goes to the Architect of the Capitol.  I

6    won't read the address, but the judgment will include it.  The

7    amount of loss is 2,000.

8         The financial obligations are immediately payable to the

9    Clerk of the Court of the U.S. District Court here in the

10   District of Columbia.  I've set out a schedule of payments.

11   Within 30 days of any change of address, you'll notify the

12   Clerk of the Court of the change until such time as the

13   financial obligations are paid in full.

14        The probation office shall release the presentence

15   investigation report to all appropriate agencies, which

16   includes the U.S. Probation Office in the approved district of

17   residence in order to execute the sentence of the Court.

18   Treatment agencies shall return the presentence report to the

19   probation office upon the defendant's completion or termination

20   from treatment.

21        Now, let me do one thing.  In terms of the notice of

22   appeal, which I'll get to -- the sentencing guidelines

23   calculation, the base offense was, as I indicated, 10 with a

24   criminal history of I.  And the range is 6 to 12 months and

25   I've chosen the middle, which is the 9 months.  So just so you

1    have that on the record.

2        And I've imposed no fine.  So I don't need to go into

3    what it would be for a -- for an offense level of 10.

4        Pursuant to 18 U.S.C. § 3742, you have a right to appeal

5    the sentence imposed by the Court if the period of imprisonment

6    is longer than the statutory maximum, which it is not, or the

7    sentence departs upward from the applicable sentencing

8    guideline range, which it does not.  I did not do a departure.

9    I simply took away the acceptance of responsibility to your

10   offense level.

11       If you choose to appeal, you must file any appeal within

12   14 days after judgment is entered.  If you need to file without

13   cost to you, you can ask the Court for that, and you can also

14   ask for counsel to be appointed, if you cannot afford one.

15       As defined in 28 U.S.C. 2255, you also have the right to

16   challenge the conviction entered or sentence imposed if new and

17   currently unavailable information becomes available to you, or

18   on a claim that you received ineffective assistance of counsel

19   in entering a plea of guilty to the offense conviction or in

20   connection with the sentencing.

21       Again, if you're unable to afford the cost of the appeal

22   under the collateral appeal, you can ask the court to allow you

23   to file it without cost to you and, again, ask for counsel to

24   be appointed if you cannot afford one.

25       I don't know whether there is a particular request for

1    where you would like to be recommended to be incarcerated.  I

2    will put a recommendation.  There's nothing to say they'll do

3    it, but I certainly will recommend it.

4              MR. MYKYTIUK:  Yes, Your Honor.  For what it's worth,

5    I would ask the Court to recommend the minimum security camp at

6    FCI El Reno, which is in Oklahoma where Mr. Ryals lives.

7              THE COURT:  I missed the last name of it.

8              MR. MYKYTIUK:  FCI El Reno, as in Reno, Nevada.

9              THE COURT:  Oh, Okay.

10             MR. MYKYTIUK:  But it's in Oklahoma.

11             THE COURT:  Okay.  All right.  I'll recommend that.

12         I will also let him voluntarily surrender.

13             MR. MYKYTIUK:  That's my next request.

14             THE COURT:  And I will pick a date in a moment to

15   allow -- allow him some time to get his matters in order and

16   to, you know, talk to his family, et cetera.

17         Pursuant -- let me finish this, and then you can -- stay

18   there.

19         There's a D.C. Circuit opinion, *U.S. v. Hunter*, which

20   was -- came down in 2016.  So I do want to ask, apart from

21   what's already been raised, whether there are any object- --

22   other objections to the sentence imposed or something else that

23   needs to be brought up at this point?  Is there anything else

24   from you or the government or probation that I need to address?

25             THE PROBATION OFFICER:  Your Honor, noting a progress

1    hearing.

2             THE COURT:  If you could come up and use the

3    microphone there.  And if you could identify yourself, please.

4             THE PROBATION OFFICER:  I apologize.

5             THE COURT:  I can hear you now.

6             THE PROBATION OFFICER:  Amy Landon for U.S. Probation

7    standing in for Probation Officer Robert Walters, who actually

8    wrote the presentence report.

9             THE COURT:  Okay.

10            THE PROBATION OFFICER:  It's my understanding that

11   the Court wishes to have a reentry progress hearing, which

12   leads the probation officer to believe that the Court is not

13   going to transfer jurisdiction but will transfer supervision to

14   the Eastern District of Oklahoma.

15            THE COURT:  Right.  I'm not transferring jurisdiction

16   at this point.  When -- once he is released, I would request

17   that the reentry be in front of me, and then if you want to

18   transfer it, I don't have a problem.  I have found that

19   transferring it immediately, sometimes there's a gap in what

20   happens.  So I want to make sure there's no issues when he is

21   released, if he's going to live someplace else -- presumably

22   not in D.C. -- to make sure that they accept the supervision

23   and will follow what -- what I've set out here.

24            So he would -- the re- -- we do the report 30 days after

25   he's released.  Based on that, I'll have a reentry, which I may

1   do, you know, on Zoom, frankly.  We'll see what -- whether I

2   need to bring him up, and we'll discuss where he gets

3   transferred at that point in terms of his supervision to make

4   sure there's no problem with that.

5            THE PROBATION OFFICER:  Yes, Your Honor.

6            THE COURT:  Okay.  Anything -- anything else you want

7   to bring up?

8            THE PROBATION OFFICER:  As far as voluntary

9   surrender, we usually have the -- we go over the documentation

10  with the defendant at the end, but it's my understanding that

11  the Court is going to set a specific date to tell the Bureau of

12  Prisons.

13           THE COURT:  Yes.  When he would be known by the

14  Bureau of Prisons, but I do think you still need to go through

15  the rest of the things at the end with him.

16           THE PROBATION OFFICER:  Thank you, Your Honor.

17           THE COURT:  Okay.  Anything else from the government

18  that I need to address?

19           MR. MCCARTHER:  Your Honor, just for the record, in

20  case there is an appeal, Your Honor was very clear about the

21  3553 factors and how it came to its sentence.  Even had this

22  Court determined that the lower guideline was in play and the

23  acceptance of responsibility points were not taken away, I

24  believe, based on the actions of the defendant and the 3553

25  factors, this Court is saying it still would have come to its

1    determination of a nine-month period of incarceration; is that

2    correct?

3              THE COURT:  Yes.

4              MR. MCCARTHER:  Nothing further from the

5    United States.

6              THE COURT:  Okay.

7         Counsel, you wanted to raise something else.

8              MR. MYKYTIUK:  It may have been answered.  I was

9    looking for clarification on the reporting.  In my -- my past

10   experience, the Bureau of Prisons has notified the defendant

11   of --

12             THE COURT:  Right.  The Bureau of Prisons will notify

13   him.  He can talk -- when we finish here, he should talk to

14   probation about this so that he knows exactly what to do.  He

15   will get a notice.  We'll pick a date today by which they --

16   it's not to be -- the way I do it is a date that he's not to be

17   incarcerated prior to that, and then at that point, they'll

18   send out whatever they're going to do because -- otherwise it

19   doesn't work.

20             MR. MYKYTIUK:  I understand.

21             THE COURT:  So I'm not picking a date for him to go.

22   They need to make the decision, but I will indicate that the

23   Bureau of Prisons is not to send him a notice to show up prior

24   to this date.  So he's free.

25             MR. MYKYTIUK:  Understood.

1    THE COURT:  They -- after this date, they'll send him

2    a notice and it depends on, you know -- their status, where

3    they're going to send him, what's -- what's involved, and

4    they'll make a decision at that point.  And, usually, it's

5    varied from, you know, a couple weeks to six weeks to whatever.

6    I don't know where they are at this point, and it probably

7    depends on where he's going, frankly, as to how quickly they

8    will do it, but I will pick a date -- and I'll talk to you at

9    this point -- by which the Bureau of Prisons can then send him

10    notices.

11    MR. MYKYTIUK:  Yes, Your Honor.  Thank you.

12    THE COURT:  All right.  So let me ask you at this

13    point, is there a particular -- I was, frankly, going to give

14    him a couple of weeks in here to get things in order before

15    he -- before they would send him a notice, and then I don't

16    control when the notice goes out.  That's going to be dependent

17    on where they want you to go and what, you know, their bed

18    space and stuff is.

19    So if I gave him through, say, three weeks, is that

20    enough time for him to get matters in order in terms of, you

21    know, his house and various other kinds of things he needs to

22    do?

23    THE DEFENDANT:  Preferably 30 days, if it was -- if

24    it was possible.

25    THE COURT:  Okay.  All right.  So -- I can do it

1    by -- I'll do it by November 15th.  Yeah, November 15th.

2    That's four weeks.  That, hopefully, will give you enough time

3    to -- to do it.

4          And think carefully -- okay? -- while you're there in

5    terms of your actions, and give some careful thought to what

6    you got involved with.  There's going to be temptations in the

7    future because I think our country, unfortunately, seems to be

8    very divided.  So I would hope that future elections will still

9    result in a peaceful transfer and not what has occurred.

10                  THE DEFENDANT:  Thank you, Your Honor.

11                  THE COURT:  All right.  When I -- hopefully, I will

12   never see you back here with violations.  I'm expecting you to

13   follow through with all these conditions.  They're pretty

14   simple.

15                  THE DEFENDANT:  Absolutely.

16                  THE COURT:  But what will happen is once you get

17   released, they'll send you, you know, to the probation office

18   closest to wherever you are.  You'll have a discussion with

19   them.  They'll send a report to me.  I'll set up some sort of a

20   hearing, and we'll move the supervision so you don't have to be

21   supervised here.

22          I am going to keep jurisdiction, though.  So if there's

23   a problem, you'll be back in front of me, not in front of some

24   other judge.  Okay?

25                  THE DEFENDANT:  Okay.

1        THE COURT:  But the -- if you're going to live in

2   Oklahoma, the probation office in Oklahoma, assuming they

3   accept supervision, would be the one that would supervise you,

4   so in terms of your reporting, et cetera.  All right?

5        THE DEFENDANT:  Okay.  Thank you, Your Honor.

6        THE COURT:  All right.  Parties are excused.

7        MR. MCCARTHER:  Your Honor.

8        THE COURT:  Yes.

9        MR. MCCARTHER:  One more thing.  Because the

10   defendant pled to an information, the United States needs to

11   move to dismiss the original indictment against Mr. Ryals.

12        THE COURT:  All right.  Then I will admit -- I'll do

13   it by written order, but I'll dismiss -- let me -- I don't seem

14   to have it in front me, but I will go ahead and dismiss the

15   other counts.

16        MR. MCCARTHER:  Thank you, Your Honor.

17        THE COURT:  All right.  Parties are excused.

18        (Proceedings were concluded at 12:37 p.m.)

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 29th day of November, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25